## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

JACQUELINE SALAZAR,

        Plaintiff,

           v.

KILOLO KIJAKAZI, Acting
Commissioner of Social Security,

        Defendant.

Civ. No. 21-149 KK

## MEMORANDUM OPINION AND ORDER[1]

THIS MATTER is before the Court on Plaintiff Jacqueline Salazar's Opposed Motion to Reverse and/or Remand, filed November 3, 2021. (Doc. 23.) On February 22, 2022, the Acting Commissioner of the Social Security Administration ("Commissioner") filed a response, and on March 18, 2022, Ms. Salazar filed a reply. (Docs. 29, 30.) Having meticulously reviewed the entire record and the relevant law, being otherwise sufficiently advised, and for the reasons set forth below, the Court finds that Ms. Salazar's Motion is well-taken and should be GRANTED.

### I. BACKGROUND AND PROCEDURAL HISTORY

Ms. Salazar filed this action under 42 U.S.C. § 405(g), seeking reversal of the Commissioner's decision denying her claims for disability insurance benefits ("DIB") under Title II of the Social Security Act. (Doc. 23 at 1.) Ms. Salazar, age 51, suffers from migraine headaches, post-traumatic stress disorder ("PTSD"), depression, and left hearing loss. (AR 15.)[2]  Her migraines began in about 2006, and she testified that she typically has "[a]nywhere between 15

---

[1] Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have consented to the undersigned to conduct dispositive proceedings and order the entry of final judgment in this case. (Doc. 18.)

[2] Citations to "AR" refer to the Certified Transcript of the Administrative Record filed on August 2, 2021. (Doc. 17.)

and 20" of them each month. (AR 47, 990.) According to Ms. Salazar, her migraines last "[a]bout half the day" and cause pain, dizziness, nausea, vomiting, and sensitivity to light and sound, and the following day she is exhausted and cannot function. (AR 46–47, 51, 54, 316.) She testified that when she feels a migraine starting, she takes Zofran for nausea, which makes her drowsy, and Excedrin migraine for pain. (AR 52–53.) According to Ms. Salazar, her migraines have many triggers, including certain foods, certain odors, sunlight, bright or fluorescent indoor lights, and sitting in a certain position for too long. (AR 45, 52, 55.)

Ms. Salazar has also been diagnosed with PTSD stemming from an automobile accident and domestic violence. (AR 781-82, 972.) She reported nightmares, startle response, social isolation, intrusive thoughts, and avoidant behaviors, (AR 781), and testified that interactions with "really rude, really mean, really aggressive" customers trigger "a lot of the memories of the abuse." (AR 49.) In addition, she takes medication for depression. (AR 49; *see, e.g.*, AR 385, 441, 448, 962.)

Ms. Salazar worked as a medical assistant for about 14 years until November 21, 2018, "but she had to miss a lot of work because of her migraines and therefore could not keep a job." (AR 199, 249, 778, 990.) On February 8, 2019, she began working part-time as a restaurant hostess, where she missed work "maybe three to seven times a month" due to migraines, worked fewer hours than other hostesses, and had more limited duties. (AR 44, 248, 250.) On March 7, 2020, she left this job to have surgery. (AR 41.)

On March 10, 2020, Ms. Salazar had surgery to remove obstructions from her right sinus. (AR 885.) Ms. Salazar testified that after the surgery, the migraines "just, like, disappeared for a little while." (AR 42.) On April 1, 2020, she began working full-time as a grocery store cashier, "because if I don't work, I'm basically, you know, out on the streets." (AR 41.) However, she

testified that her migraines returned "about a month" after the sinus surgery, and she reduced her hours to 20 hours per week beginning on August 23, 2020.[3] (AR 50, 53.)

Ms. Salazar filed a claim for DIB on December 3, 2018, alleging disability beginning on November 21, 2018. (AR 165.) Ms. Salazar's claim was denied initially and upon reconsideration. (AR 102–05, 111–13.) On October 8, 2019, she requested a hearing before an Administrative Law Judge ("ALJ"), which was held on August 25, 2020. (AR 29–60, 117–18.) On October 27, 2020, the ALJ issued an unfavorable decision. (AR 12–23.)

In her decision, the ALJ applied the Commissioner's five-step evaluation process.[4] At step one, the ALJ determined that Ms. Salazar's work as a restaurant hostess was not substantial gainful activity ("SGA") but that she had engaged in SGA from the time she started working as a grocery store cashier, *i.e.*, April 1, 2020, to the date of the ALJ's decision. (AR 14-15.) The ALJ therefore found at least a "continuous 12-month period(s) during which the claimant did not engage in [SGA]," *i.e.*, the 16 months from Ms. Salazar's alleged onset date to April 1, 2020. (*Id.*) The ALJ

---

[3] The Court takes judicial notice that the date of Ms. Salazar's hearing, *i.e.*, August 25, 2020, fell on a Tuesday, and thus that the "Sunday" on which Plaintiff testified she began working reduced hours was August 23, 2020. (AR 50.)

[4] The five-step sequential evaluation process requires the ALJ to determine whether:

    (1)     the claimant engaged in substantial gainful activity during the alleged period of disability;
    (2)     the claimant has a severe physical or mental impairment (or combination of impairments) that meets the duration requirement;
    (3)     any such impairment meets or equals the severity of a listed impairment described in Appendix 1 of 20 C.F.R. Part 404, Subpart P;
    (4)     the claimant can return to her past relevant work; and, if not,
    (5)     the claimant is able to perform other work in the national economy, considering her residual functional capacity, age, education, and work experience.

20 C.F.R. § 404.1520(a)(4); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005). The claimant has the burden of proof in the first four steps of the analysis and the Commissioner has the burden of proof at step five. *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). A finding that the claimant is disabled or not disabled at any point in the process is conclusive and terminates the analysis. *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991).

indicated that her remaining findings addressed "the period(s) [Ms. Salazar] did not engage in [SGA]." (AR 15.)

At step two, the ALJ found that Ms. Salazar has the severe impairments of PTSD, depression, migraines, and left hearing loss. (*Id.*) The ALJ also determined that Ms. Salazar's "deviated septum, vertigo, hypothyroid, and osteoarthritis of the hand do not significantly limit her ability to perform basic work activities and are non-severe." (*Id.*) At step three, the ALJ found that Ms. Salazar's impairments do not meet or medically equal the severity of one of the Listings described in Appendix 1 of 20 C.F.R. Part 404, Subpart P. (AR 15-17.)

At step four,[5] the ALJ found that Ms. Salazar

has the residual functional capacity [("RFC")] to perform a full range of work at all exertional levels but with the following non-exertional limitations: she can never climb ladders, ropes, or scaffolds; she can never be exposed to unprotected heights, hazardous machinery, or concentrated exposure to environmental irritants or sunlight; the noise level of the work environment should be moderate or less; she cannot operate a motor vehicle for commercial purposes; she can perform simple and some detailed tasks, with no fast-paced production work; and she can occasionally interact with the general public.

(AR 17.) The ALJ further found that Ms. Salazar is unable to perform her past relevant work as a medical assistant. (AR 21.)

At step five, the ALJ found that there is other work Ms. Salazar can perform that exists in significant numbers in the national economy. (AR 21-22.) In making this determination, the ALJ relied on the vocational expert's testimony that a hypothetical individual with Ms. Salazar's age, education, work experience, and assigned RFC would be able to perform the representative

---

[5] Step four involves three phases. *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). First, the ALJ must consider all of the relevant evidence and determine what is "the most [the claimant] can still do despite [her physical and mental] limitations." 20 C.F.R. § 404.1545(a)(1). This is the claimant's residual functional capacity. *Id.* Second, the ALJ must determine the physical and mental demands of the claimant's past work. *Winfrey*, 92 F.3d at 1023. Third, the ALJ must determine whether the claimant is capable of meeting those demands given her residual functional capacity. *Id.* A claimant who can perform her past relevant work is not disabled. 20 C.F.R. § 404.1520(f).

occupations of marker, router, and collator operator. (*Id.*) The ALJ therefore concluded that Ms. Salazar "has not been under a disability, as defined in the Social Security Act, from November 21, 2018, through the date of this decision[.]" (AR 22.)

Ms. Salazar appealed the ALJ's decision to the Appeals Council, and on January 12, 2021, the Appeals Council denied her request for review. (AR 1–3.) The ALJ's decision is thus the Commissioner's final decision from which Ms. Salazar now appeals.

## II.  STANDARD OF REVIEW

The Court's review of the Commissioner's final decision is limited to determining whether substantial evidence supports the ALJ's factual findings and whether the ALJ applied the correct legal standards to evaluate the evidence. 42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004). In making these determinations, the Court must meticulously examine the entire record but may neither reweigh the evidence nor substitute its judgment for that of the agency. *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007). In other words, the Court does not reexamine the issues *de novo*. *Sisco v. U.S. Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993).

The Court will not disturb the Commissioner's final decision if it correctly applies legal standards and is based on substantial evidence in the record. *Hamlin*, 365 F.3d at 1214. "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004). It is "more than a scintilla, but less than a preponderance." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). "A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *Langley,* 373 F.3d at 1118, or "constitutes mere conclusion." *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992). The Court's examination of the record as a whole must include

"anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005).

"The failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (quotation marks and brackets omitted). Although an ALJ is not required to discuss every piece of evidence, "[t]he record must demonstrate that the ALJ considered all of the evidence," and "in addition to discussing the evidence supporting [her] decision, the ALJ also must discuss the uncontroverted evidence [she] chooses not to rely upon, as well as significantly probative evidence [she] rejects." *Clifton v. Chater*, 79 F.3d 1007, 1009–10 (10th Cir. 1996). If the ALJ fails to do so, "the case must be remanded for the ALJ to set out [her] specific findings and [her] reasons for accepting or rejecting evidence[.]" *Id.* at 1010.

### III. DISCUSSION

Ms. Salazar argues that remand is warranted because, in assessing Ms. Salazar's RFC, the ALJ: (1) failed to account for or adequately explain her rejection of a moderate mental limitation to which Bonnie Chavez, Ph.D., and Joy Kelley, Ph.D., opined; and, (2) failed to consider or adequately explain her rejection of significantly probative medical evidence related to Ms. Salazar's migraines.[6] (Doc. 23 at 20–21.) For the reasons discussed below, the Court finds these arguments well taken.

---

[6] Ms. Salazar also argues that the ALJ failed to "meaningfully consider the possibility of a closed period of disability." (Doc. 23 at 21–22.) However, this argument is plainly without merit because a closed period of disability is exactly what the ALJ did consider. Specifically, the ALJ explained that her decision "address[ed]" the "continuous 12-month period(s) during which the claimant did not engage in [SGA]," *i.e.*, the period from November 21, 2018 (Ms. Salazar's alleged onset date) to April 1, 2020 (the date Ms. Salazar began working full-time as a cashier). (AR 15.)

### A. The ALJ failed to account for or adequately explain her rejection of a moderate mental limitation to which Drs. Chavez and Kelley opined.

Ms. Salazar first argues that the ALJ erred because, in assessing Ms. Salazar's RFC, she failed to account for or adequately explain her rejection of a moderate mental limitation to which state agency psychological consultants Drs. Chavez and Kelley opined. (Doc. 23 at 20.) An ALJ may account for moderate functional limitations that a medical source assesses "by limiting the claimant to particular kinds of work activity" in her RFC determination. *Smith v. Colvin*, 821 F.3d 1264, 1269 (10th Cir. 2016). However, when the ALJ assigns an RFC that contradicts a medical source opinion, the ALJ must explain why she did not account for the opinion in the RFC. *Givens v. Astrue*, 251 F. App'x 561, 568 (10th Cir. 2007) ("If the ALJ rejects any significantly probative medical evidence concerning [the claimant's] RFC, [she] must provide adequate reasons for [her] decision to reject that evidence."). Where the ALJ does not adequately support her rejection of a medical source opinion concerning the claimant's RFC, the case must be remanded for the ALJ to do so. *Frantz v. Astrue*, 509 F.3d 1299, 1302-03 (10th Cir. 2007); *Haga v. Astrue*, 482 F.3d 1205, 1207-09 (10th Cir. 2007).

In 2017, the Commissioner issued new regulations regarding the evaluation of medical source opinions for claims filed on or after March 27, 2017. *See* "Revisions to Rules Regarding the Evaluation of Medical Evidence," 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017); *compare* 20 C.F.R. § 404.1527 ("Evaluating opinion evidence for claims filed before March 27, 2017") *with* 20 C.F.R. § 404.1520c ("How we consider and articulate medical opinions and prior administrative medical findings for claims filed on or after March 27, 2017"). Because Ms. Salazar filed her claims in December 2018, (AR 165), the more recent regulations apply to this matter.

The newer regulations provide that the agency "will articulate in our determination or decision how persuasive we find all of the medical opinions and all of the prior administrative

medical findings[7] in your case record." 20 C.F.R. § 404.1520c(b). Addressing the agency's "articulation requirements," the regulations state that,

> when a medical source provides multiple medical opinion(s) [sic] or prior administrative medical finding(s) [sic], we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.

20 C.F.R. § 404.1520c(b)(1). The regulations further provide that

> [t]he factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions or prior administrative medical findings in your case record.

20 C.F.R. § 404.1520c(b)(2). "[T]he factors in paragraphs (c)(3) through (c)(5)" are the source's "[r]elationship with the claimant," the source's "[s]pecialization," and "other factors that tend to support or contradict a medical opinion or a prior administrative medical finding." 20 C.F.R. § 404.1520c(c)(3)-(c)(5).

As the Tenth Circuit has explained,

> "[s]upportability" examines how closely connected a medical opinion is to the evidence and the medical source's explanations: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to

---

[7] "A prior administrative medical finding is a finding, other than the ultimate determination about whether you are disabled, about a medical issue made by our Federal and State agency medical and psychological consultants at a prior level of review." 20 C.F.R. § 404.1513(a)(5). Under the Commissioner's regulations, ALJs are to use the same standards to review medical opinions and prior administrative medical findings. 20 C.F.R. § 404.1520c. As such, and for ease of reference, the Court refers to the prior administrative medical findings of state agency psychological consultants Drs. Chavez and Kelley as opinions in this Memorandum Opinion and Order.

support his or her medical opinion(s), the more persuasive the medical opinions will be." [20 C.F.R.] § 404.1520c(c)(1); *id.* § 416.920c(c)(1). "Consistency," on the other hand, compares a medical opinion to the evidence: "The more consistent a medical opinion(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) will be." *Id.* § 404.1520c(c)(2); *id.* § 416.920c(c)(2).

*Zhu v. Comm'r, SSA*, — F. App'x —, 2021 WL 2794533, at *6 (10th Cir. Jul. 6, 2021), *cert. denied*, — U.S. —, 142 S. Ct. 2838 (Jun. 21, 2022) (brackets and ellipses omitted).

The agency's new regulations do not, in the Court's view, alter the Tenth Circuit's requirement that an ALJ must explain her rejection of any medical source opinions in the record concerning the claimant's RFC. *Frantz*, 509 F.3d at 1302-03; *Haga*, 482 F.3d at 1208; *Givens*, 251 F. App'x at 568. This requirement flows from the premise that an ALJ's decision must "discuss the uncontroverted evidence [the ALJ] chooses not to rely upon, as well as significantly probative evidence [she] rejects," *Clifton*, 79 F.3d at 1010, in order to provide the Court "with a sufficient basis to determine that appropriate legal principles have been followed[.]" *Jensen*, 436 F.3d at 1165. The requirement enables the courts to engage in meaningful judicial review of agency decisions.

Moreover, "all the ALJ's required findings must be supported by substantial evidence, and he must consider all relevant medical evidence in making those findings." *Grogan*, 399 F.3d at 1262 (quotation marks and citations omitted). Thus, the ALJ's reasons for rejecting medical opinions regarding the claimant's work-related abilities must be supported by substantial evidence, and the ALJ must consider all relevant medical evidence in weighing those opinions. *Id.*; *see generally, e.g., Langley*, 373 F.3d at 1116 (reversing ALJ's decision where, *inter alia*, ALJ's reasons for rejecting medical opinions were not or did not appear to be supported by substantial evidence).

Ms. Salazar argues that the ALJ failed to account for or adequately explain her rejection of the opinions of Drs. Chavez and Kelley that Ms. Salazar is moderately limited in her ability to "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (Doc. 23 at 20; AR 77, 98.) The Court notes that Drs. Chavez and Kelley also found Ms. Salazar to be moderately limited in her ability to understand, remember, and carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or proximity to others without being distracted by them, interact appropriately with the general public, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and be aware of normal hazards and take appropriate precautions.[8] (AR 77-78, 98-99.)

Drs. Chavez and Kelley explained their opinions regarding Ms. Salazar's sustained concentration and persistence limitations by stating that "[t]rauma related symptoms interfere with sustained concentration and may interrupt day/week at times." (AR 77, 98.) In their "Additional Explanation[s]," they added that Ms. Salazar "demonstrates the ability to complete basic work tasks, concentrate adequately for routine tasks, interact with supervisor and coworkers with superficial interactions with the general public, and adapt to routine work changes in the absence of frequent trauma triggers." (AR 78, 99.)

In her decision, the ALJ found the opinions of Drs. Chavez and Kelley to be "only partially persuasive," because

---

[8] Ms. Salazar argues that the ALJ also erred in her treatment of the opinions of Drs. Chavez and Kelley that Ms. Salazar is moderately limited in her ability "be aware of normal hazards and take appropriate precautions." (Doc. 23 at 20-21.) However, Ms. Salazar has not identified the "normal hazards" she claims the ALJ failed to account for; and in fact, it appears that the ALJ did adequately account for this moderate limitation by assigning Ms. Salazar an RFC that precludes her from climbing ladders, ropes, or scaffolds, exposure to unprotected heights or hazardous machinery, and driving a motor vehicle for commercial purposes. (AR 17.)

> [Ms. Salazar] has had limited mental health treatment and mental status examinations. Further, from a mental perspective, she successfully performed semi-skilled work in 2019 and 2020; therefore, she is not limited to simple work. There is also no evidence that the claimant has had any difficulty interacting with her co-workers at either her part-time job as a waitress or her full time job at Smith's.

(AR 20.) Additionally, the ALJ noted that "no gross deficits have been found during any mental status examination." (*Id.*)

The Court finds that, in two interconnected respects, the ALJ erred in her treatment of Dr. Chavez's and Dr. Kelley's opinions regarding Ms. Salazar's moderately limited ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. First, on their face, the mental limitations in the assigned RFC do not account for this limitation. (*See* AR 17 (limiting Ms. Salazar to "simple and some detailed tasks, with no fast-paced production work," and "occasional" interactions with the general public); *see also Haga*, 482 F.3d at 1208 ("[A] moderate impairment is not the same as no impairment at all."); POMS DI § 25020.010(B)(3)(*i*)[9] (ability to complete normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without unreasonable number and length of rest periods is a mental ability critical for performing unskilled work and "[t]hese requirements are usually strict").

The Commissioner suggests that the assigned RFC adequately accounts for this limitation because it restricts Ms. Salazar to simple and some detailed tasks and no fast-paced production work.[10]

---

[9] The Program Operations Manual System, or POMS, "is a set of policies issued by the Social Security Administration to be used in processing claims." *Anders v. Berryhill*, 688 F. App'x 514, 520 n.2 (10th Cir. 2017) (quotation marks and brackets omitted). The Court must defer to POMS provisions unless it determines they are arbitrary, capricious, or contrary to law. *Id.*

[10] The Commissioner also argues that substantial evidence supported the mental RFC the ALJ assigned because Ms. Salazar testified she was handling her work as a cashier "okay." (Doc. 29 at 17.) However, the ALJ did not construe

(Doc. 29 at 16-17.) And, the Tenth Circuit *has* found in some instances that "an administrative law judge can account for moderate limitations by limiting the claimant to particular kinds of work activity." *Smith*, 821 F.3d at 1269; *see also Vigil v. Colvin*, 805 F.3d 1199, 1204 (10th Cir. 2015). However, this is not always the case. *Vigil*, 805 F.3d at 1204; *Groberg v. Astrue*, 505 F. App'x 763, 770 (10th Cir. 2012). Thus, "[u]nless the connection (between the limitation and the work) is obvious, … the agency must ordinarily explain how a work-related limitation accounts for mental limitations reflected in a medical opinion." *Parker v. Comm'r, SSA*, 772 F. App'x 613, 616 (10th Cir. 2019).

In this case, the connection between the limitation and the work is not obvious. The assigned RFC's limitation to simple and some detailed tasks and no fast-paced production work *does* appear to address Ms. Salazar's moderately impaired ability, per Drs. Chavez and Kelley, to understand, remember, and carry out detailed instructions, maintain attention and concentration for two-hour periods,[11] and work in coordination with or proximity to others without being distracted by them. (AR 77, 98.) But the connection between these limitations and an impaired ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods is not clear.[12] And, absent an adequate explanation from the ALJ on this point, it would

---

the pertinent testimony in the same way the Commissioner does. Rather, she understood Ms. Salazar to mean that Ms. Salazar was handling problems with her grandson and his mother "okay." (AR 18.)

[11] The POMS explains that the "extended periods" for which an employee must be able to concentrate and pay attention are "the approximately 2-hour segments between arrival and first break, lunch, second break, and departure." POMS DI § 25020.010(B)(2)(a).

[12] The Court is aware that the three representative occupations on which the ALJ relied are unskilled, (AR 22); but, even if the ALJ had limited Ms. Salazar to simple tasks, the connection between the limitation and the work would not be obvious. *See Sylvina T. v. Kijakazi*, No. CV 21-429 MV/SCY, 2022 WL 3042929, at *5 (D.N.M. Aug. 2, 2022), *report and recommendation adopted sub nom. Thomas v. Kijakazi*, No. 21-CV-429-MV/SCY, 2022 WL 3577063 (D.N.M. Aug. 19, 2022) (holding that limiting the claimant to "simple, routine tasks" did not account for moderately

be inappropriate for the Court to speculate about what that connection might be. *Cf. Peterson v. Saul*, 19-cv-486, 2020 WL 1911567, at *12 (D.N.M. Apr. 20, 2020) (restriction to simple, routine tasks did not sufficiently account for moderate limitation in ability to complete normal workday and workweek without interruptions and perform at consistent pace without an unreasonable number and length of rest periods).

Nor does *Fannin v. Commissioner, SSA*, 857 F. App'x 445 (10th Cir. 2021), redeem the ALJ's omission. In *Fannin*, the Tenth Circuit held that, when asking hypothetical questions to a vocational expert, an ALJ may rely on an agency consultant's narrative mental RFC so long as the narrative RFC is consistent with the limitations found on the worksheet portions of the form.[13] *Fannin*, 857 F. App'x at 447–48; *see also Smith*, 821 F.3d at 1269 (finding that the ALJ incorporated worksheet limitations "by stating how the claimant was limited in the ability to

---

limited ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and noting that this ability "is needed for all work, even simple work").

[13] In *Fannin* and related cases, the Tenth Circuit relies on the instructions in the POMS for the SSA-4734-F4-SUP mental RFC assessment form, which is divided into three sections. *See Fannin*, 857 F. App'x at 446-48; *Lee v. Colvin*, 631 F. App'x 538, 540–41 (10th Cir. 2015); *see also* POMS DI 25020.010(B)(1). Here, however, the state agency consultants used the electronic Claims Analysis Tool ("eCAT"), and their assessments are included as the MRFCA portion of the Disability Determination Explanation ("DDE").

Although the MRFCA portion of the DDE is not divided into three sections like the SSA-4734-F4-SUP, courts have found that Section I of the SSA-4734-F4-SUP is analogous to the worksheet portions of the DDE, and Section III is analogous to the narrative portions. *See, e.g., Vienna v. Saul*, No. 18-cv-783, 2019 WL 4686718, at *4 n.8 (D.N.M. Sept. 26, 2019) ("Although SSA-4734-F4-SUPs (MRFCAs) completed through eCAT no longer have these section labels, parties and the courts have continued to refer to the checkbox portion of each MRFCA as 'Section I,' and the 'narrative' portion(s) as 'Section III.'"); *but cf. Cordova v. Berryhill*, No. 17-cv-0611, 2018 WL 2138647, at *6 (D.N.M. May 9, 2018) ("[T]he Court cannot agree with Defendant that in this case, the ALJ was permitted to ignore the 'Section I' findings when there is no 'Section I' in [the MRFCA form at issue.]").

However, whereas the SSA-4734-F4-SUP "instructs completing psychologists to offer their narrative conclusions separately in Section III, which is labeled 'Functional Capacity Assessment,'" the MRFCA portion of the DDE "instructs completing psychologists to input narrative conclusions after each category of mental function." *Kim L.P. v. Saul*, No. 18-cv-552, 2020 WL 5802927, at *3 (N.D. Okla. Sept. 29, 2020). Thus, in the MRFCA portion of the DDE, the "Section III" narrative is divided across the four sections, requiring the consultant to specify a mental RFC for each of four categories of mental function, *i.e.*, "understanding and memory," "sustained concentration and persistence," "social interaction," and "adaptation." (AR 77-78, 98-99.)

perform work-related activities"). However, the Tenth Circuit has made clear that an ALJ should not "turn a blind eye to any moderate limitations enumerated in [the worksheet sections] that are not adequately explained" in the narrative sections. *Lee v. Colvin*, 631 F. App'x 538, 541 (10th Cir. 2015); *see also Carver v. Colvin*, 600 F. App'x 616, 619 (10th Cir. 2015) (explaining that the POMS requires consultants to incorporate in the narrative portion all limitations found in the worksheet portion). An ALJ may only disregard limitations found in the worksheet portions when the narrative portions "adequately encapsulate[]" them. *Carver*, 600 F. App'x at 619.

Here, in the narrative section of the portion of the MRFCA form regarding "sustained concentration and persistence," Drs. Chavez and Kelley each wrote that Ms. Salazar's "[t]rauma related symptoms … may interrupt day/week at times." (AR 77, 98.) Thus, essentially, these narratives restate the opinions of Drs. Chavez and Kelley in the worksheet section of this portion of the form, that Ms. Salazar is moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (*Id.*) Nevertheless, the ALJ did not account for the narrative limitations in Ms. Salazar's assigned RFC, any more than she accounted for the worksheet limitations. In other words, although the narrative limitations adequately encapsulate the worksheet limitations, this does not redeem the ALJ's error, because she failed to account for both sets of limitations.

Turning, then, to the second and related reason the ALJ erred in her treatment of the opinions of Drs. Chavez and Kelley that Ms. Salazar is moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, the ALJ did not adequately explain her apparent rejection of these opinions. As noted

above, the ALJ gave the following reasons for finding the opinions of Drs. Chavez and Kelley only partially persuasive:  (1) Ms. Salazar has had "limited mental health treatment"; (2) she has had "limited mental status examinations" at which "no gross deficits" were found; (3) she "successfully performed semi-skilled work in 2019 and 2020"; and, (4) "[t]here is … no evidence that [she] has had any difficulty interacting with her co-workers at either her part-time job as a waitress [sic] or her full time job at Smith's." (AR 20.)

Regarding the ALJ's first reason, the ALJ described Ms. Salazar's "limited mental health treatment" elsewhere in her decision by stating that Ms. Salazar "has not undergone psychiatric treatment or counseling." (AR 19.) However, in so stating, the ALJ failed to discuss three references to counseling in Ms. Salazar's medical records, *i.e.*:

- On March 2, 2019, consultative medical examiner Danielle Mascarenas, M.D., reported that, for her history of depression and PTSD, Ms. Salazar "is currently taking medication and has received counseling in the past," (AR 765);

- On September 30, 2019, Nurse Practitioner Ruthie Guzman noted that Ms. Salazar was "[c]urrently in counseling with Michael Cummings,"[14] (AR 972); and,

- On December 12, 2019, Deborah Van Willigen, M.D., wrote in a treatment note that Ms. Salazar "will reach out to her counselor[. W]e did discuss the importance of checking in with a counselor when one's holidays are difficult." (AR 962.)

Also, on her "Disability Report – Appeal – Form SSA-3441," dated October 9, 2019, Ms. Salazar indicated that she had seen Dr. Cummings between May and August of 2019 for "exams, evals, check ups, [and] counseling." (AR 276, 279; Doc. 17-2 at 2.) Nevertheless, the ALJ did not ask Ms. Salazar at her August 2020 hearing whether she had ever received counseling, nor did the ALJ otherwise develop the record on this point. (AR 29-60); *see Thompson v. Sullivan*, 987 F.2d 1482,

---

[14] On March 21, 2019, Michael A. Cummings, Ph.D., conducted a consultative psychological examination of Ms. Salazar. (AR 778-82.) Based on his name and address, this appears to be the same Dr. Cummings that Ms. Salazar later saw for "exams, evals, check ups, [and] counseling." (AR 279, 778.)

1492 (10th Cir. 1993) (ALJ's "duty to develop the record pertains even if the claimant is represented by counsel"); *Baker v. Bowen,* 886 F.2d 289, 292 (10th Cir. 1989) (noting agency's "important burden of fully and fairly developing the record"). Thus, at best, the Court has grave doubts about whether substantial evidence supports the ALJ's finding that Ms. Salazar has received no counseling.

Also, in finding that Ms. Salazar has not undergone psychiatric treatment, the ALJ appeared to discount uncontroverted evidence that Ms. Salazar has been prescribed psychiatric medication since at least January 2016 and that her providers have changed her medication or adjusted its dosage several times to address her symptoms. (*See* AR 385 (in January 2016, Susan McQuade, F.N.P., prescribed duloxetine,[15] noting that Ms. Salazar "[f]eels that depression has worsened and has been on Lexapro[16] >10 years"); AR 375, 448 (in April 2016, FNP McQuade switched Ms. Salazar back to escitalopram due to dizziness and forgetfulness caused by duloxetine); AR 441 (in September 2017, FNP McQuade substituted venlafaxine[17] for escitalopram); AR 962 (in December 2019, Deborah Van Willigen, M.D., increased Ms. Salazar's venlafaxine dosage).) The ALJ appeared to justify discounting this evidence on the basis that Ms. Salazar received her psychiatric medication and diagnoses from "her primary care physician." (AR 19.) However, the ALJ's implication that Ms. Salazar's psychiatric treatment was limited or non-existent because prescribed by a primary care provider is illogical and unsupported by any record evidence. Certainly, there is no evidence that duloxetine, escitalopram, or venlafaxine is more or

---

[15] Duloxetine, or Cymbalta, is used to treat depression and generalized anxiety disorder. https://medlineplus.gov/druginfo/meds/a604030.html (last accessed Sept. 20, 2022).

[16] Escitalopram, or Lexapro, is used to treat depression and generalized anxiety disorder. https://medlineplus.gov/druginfo/meds/a603005.html (last accessed Sept. 20, 2022).

[17] Venlafaxine, or Effexor, is used to treat depression, generalized anxiety disorder, social anxiety disorder, and panic disorder. https://medlineplus.gov/druginfo/meds/a694020.html (last accessed Sept. 20, 2022).

less potent or effective depending on the prescriber. Moreover, to the extent a provider specializing in mental health treatment is required to validate Ms. Salazar's mental health diagnoses, psychologist Dr. Cummings diagnosed Ms. Salazar with PTSD and overlapping depressive symptoms. (AR 781-82.)

The ALJ's reliance on Ms. Salazar's "limited … mental status examinations" finding "no gross deficits" is also inadequate. (AR 20.) Initially, the ALJ failed to explain why a limited quantity of mental status examinations would undercut the opinions of Drs. Chavez and Kelley, nor is such an explanation obvious. Moreover, though the ALJ did acknowledge Dr. Cummings' determination that Ms. Salazar "had some word findings [sic] problems," she did not acknowledge his other abnormal mental status findings, *i.e.*, "mild difficulty completing serial sevens" and "fair" social judgment and insight. (AR 16, 20, 781 (italics omitted).) Also, the ALJ failed to discuss significantly probative evidence indicating that Ms. Salazar's mental health symptoms would not necessarily present in a clinical setting at all, because they occur in response to specific triggers, such as migraines, being in the community, and witnessing violence or shouting. (*See* AR 779 (Ms. Salazar described her mood as "'depressed' when migraines occur"); AR 780 (Ms. Salazar reported that she "feel[s] nervous when in the community" and "cannot watch movies that include violence and shouting").)

The ALJ's next reason for rejecting the opinions of Drs. Chavez and Kelley, *i.e.*, that Ms. Salazar "successfully performed semi-skilled work in 2019 and 2020," is also inadequate. (AR 20.) It is uncontroverted that, as a restaurant hostess in 2019 and 2020, Ms. Salazar worked only about 23 hours per week and had limited duties. (AR 248, 250.) As such, her ability to perform this job does not, without more, undercut the opinions of Drs. Chavez and Kelley that she is moderately limited in her ability to complete a *normal* workday and workweek without

interruptions from psychologically based symptoms. Moreover, the ALJ failed to acknowledge the evidence that Ms. Salazar performed limited duties, and twice erroneously referred to her working as a "waitress" rather than a hostess, (AR 19, 20)—a potentially significant mistake given the differences between these occupations' respective job duties.

As for Ms. Salazar's job as a cashier in 2020, the ALJ should not have relied on it because Ms. Salazar held this job outside the closed period of disability the ALJ considered. (AR 14-15.) Moreover, Ms. Salazar's uncontroverted testimony is that she only performed this job full time for four months, (AR 41, 50); and again, her ability to perform it part time does not, without more, undercut the opinions of Drs. Chavez and Kelley regarding the limitation at issue. Further, the Court cannot ascertain whether the ALJ properly considered Ms. Salazar's testimony that she cut back her hours in August of 2020 because the ALJ's decision is internally inconsistent on this point. (*Compare* AR 15 ("[Ms. Salazar] testified at hearing she continues to work full-time") *and* AR 19 ("She has also worked full-time at SGA since April 2020.") *with* AR 18 ("She has reduced her hours down to 20 hours per week this week on Sunday."[18]).) In light of the foregoing, and the ALJ's failure to explain how Ms. Salazar's limited work as a hostess nevertheless shows that she could do more than Drs. Chavez and Kelley opined, the Court cannot say whether the ALJ applied correct legal standards. *See Aguilar v. Soc. Sec. Admin.*, 356 F. Supp. 3d 1141, 1148 (D. Colo. 2018) (remanding where ALJ's explanations for her treatment of medical source opinions were "both inconsistent and largely irrelevant").

---

[18] The ALJ's statement that Ms. Salazar reduced her hours "this week," while it appears to be more accurate than her statements that Ms. Salazar continued to work full time, still appears to be inaccurate because Ms. Salazar testified that she reduced her hours the week of the August 2020 hearing, not the week of the ALJ's October 2020 decision. (AR 18, 50.)

As noted above, the ALJ's final reason for rejecting the opinions of Drs. Chavez and Kelley is that there is "no evidence that [Ms. Salazar] has had any difficulty interacting with her co-workers." (AR 20.) However, this reason is wholly irrelevant to the limitation in question here, *i.e.*, the moderately limited ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. In fact, the Court cannot tell whether any of the reasons the ALJ gave for rejecting the opinions of Drs. Chavez and Kelley were meant to apply to their opinions regarding this limitation, or whether the ALJ simply did not consider it. The ALJ referred to Dr. Chavez's and Dr. Kelley's findings of a "moderate limitation with attention, concentration, and pace," but she did not mention persistence. (AR 20.) Yet, clearly, Drs. Chavez and Kelley also intended to opine to a persistence limitation in light of their narratives stating that Ms. Salazar's "[t]rauma related symptoms … may interrupt day/week at times." (AR 77, 98.)

When an ALJ does not account for functional limitations a medical source assesses by limiting the claimant to particular kinds of work activity, but instead assigns an RFC that contradicts a medical source opinion, the ALJ must explain why she did not account for the medical opinion in her RFC determination. *Frantz*, 509 F.3d at 1302-03; *Givens*, 251 F. App'x at 568. And, where the ALJ does not adequately explain her rejection of a medical source opinion concerning the claimant's RFC, the case must be remanded for the ALJ to do so. *Haga*, 482 F.3d at 1208-09; *Frantz*, 509 F.3d at 1302-03; *Givens*, 251 F. App'x at 568. Here, the ALJ did not adequately explain her failure to incorporate into Ms. Salazar's assigned RFC the opinions of Drs. Chavez and Kelley that Ms. Salazar is moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. As such,

the case must be remanded for the ALJ to provide the required explanation or account for the limitation in the RFC.

### B. The ALJ failed to consider or adequately explain her rejection of significantly probative medical evidence regarding Ms. Salazar's migraines.

As noted above, although an ALJ is not required to discuss every piece of medical evidence in the record, she must discuss any significantly probative evidence she rejects and provide adequate reasons for the rejection. *Clifton*, 79 F.3d at 1009–10; *Givens*, 251 F. App'x at 568. Here, Ms. Salazar argues that the ALJ erred in her treatment of medical evidence showing a "pattern of frequent and severe migraines … demonstrated by around twenty-two (22) presentations to various providers with severe migraine and headache symptoms between April 2016 and February 2020." (Doc. 23 at 21.) Ms. Salazar asserts that the ALJ improperly ignored or discounted this evidence, which supports Plaintiff's testimony that she suffers from frequent, debilitating migraines. (*Id.*) As explained below, the Court agrees.

In several respects, the ALJ did not adequately explain her finding that Ms. Salazar's "testimony regarding the frequency and consistent [sic] of her migraine headaches is inconsistent with the objective medical evidence." (AR 18.) First, the ALJ's statement that Ms. Salazar "has only treated twice at the emergency room for migraine headaches, February 27, 2017 and July 25, 2018," is both inadequate and inaccurate. (AR 18; *see* AR 392-93, 672-77.) Not only does it fail to undercut Ms. Salazar's testimony about the frequency and intensity of her symptoms, but also, the record indicates that she sought treatment at the emergency room for her migraines on a third occasion as well, *i.e.*, on December 23, 2016. (AR 394-96.) Additionally, when she presented to the emergency room with flu-like symptoms on January 27, 2019, she also reported a persistent and "excruciating" headache. (AR 717, 723.)

Second, the ALJ relied on Dr. Mascarenas' failure to opine to any limitations related to Ms. Salazar's migraines other than "some relevant work place environmental limitations."[19] (AR 20, 771.) However, the ALJ failed to discuss that, in her report, Dr. Mascarenas identified not only the limitations she found, but also the limitations she rejected, writing that Ms. Salazar has "no limitations with sitting, standing or walking," "does not need an assistive device," "does not have significant limitations with lifting or carrying weight," has "no limitations on bending, stopping, crouching and squatting," "no limitations on reaching, grasping, handling, fingering and feeling," and "no relevant visual or communicative limitations." (AR 771.) Notably, Dr. Mascarenas did *not* mention and does not appear to have considered whether Ms. Salazar had any mental limitations associated with her migraines; and indeed, such limitations would have been outside the scope of Dr. Mascarenas' examination, which was purely physical.[20] (*See* AR 765-71.) Thus, Dr. Mascarenas' opinions also fail to undercut Ms. Salazar's testimony regarding the frequency and intensity of her migraines.

Finally, the ALJ observed that Ms. Salazar's "most recent medical records show significant improvement in the migraines with the Aimovig injection, followed by sinus surgery.[21] She also

---

[19] Nowhere did Dr. Mascarenas identify what the "relevant work place environmental limitations" to which she referred might be. (AR 765-71.) In her report, Dr. Mascarenas noted that Ms. Salazar's migraine symptoms "are exacerbated by increased stress and certain dietary choices," (AR 765), but she did not discuss any environmental migraine triggers. (AR 765-71.)

[20] Notably, however, Dr. Mascarenas did observe physical symptoms consistent with Ms. Salazar's report of a "resolving" headache, *i.e.*, "numbness and tingling in fingertips bilaterally" and elevated blood pressure, both of which supported her "[p]robable [d]iagnos[i]s" of "[m]igraines." (AR 769-70.)

[21] The Commissioner argues that the ALJ's rejection of Ms. Salazar's testimony regarding the frequency and intensity of her migraines was proper because Ms. Salazar testified that sinus surgery only relieved her migraines for "about a month," (AR 53), but she told her neurologist that she was still experiencing "virtually" complete relief about four months after the surgery. (Doc. 29 at 12; AR 1004.) However, the ALJ did not discuss this apparent discrepancy in assessing Ms. Salazar's RFC, (*see* AR 17-21), and the Commissioner's argument is therefore a post-hoc rationale that the Court cannot consider. *See Haga*, 482 F.3d at 1207–08 (courts "may not create or adopt post-hoc rationalizations to support the ALJ's decision that are not apparent from the ALJ's decision itself"); *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004) (ALJ's decision must be evaluated "solely on the reasons stated in the decision"); *see also Allen v. Barnhart*, 357 F.3d 1140, 1142 (10th Cir. 2004) ("Affirming this post hoc effort to salvage the ALJ's

told her medical providers that she is still having headaches but she has not had to miss work." (AR 21.) However, with respect to the Aimovig injections, the ALJ failed to discuss that when Ms. Salazar reported she had not had to miss work, she was working limited hours with limited duties and was not engaged in SGA. (*See* AR 248, 250 (in February 2019, Ms. Salazar began working as a hostess with limited hours and duties); AR 994 (in December 2019, Ms. Salazar reported to neurologist Kamasamudram Ravilochan, M.D., that she had not had to miss work due to headaches); AR 41 (in March 2020, Ms. Salazar left her hostess job); *see also* AR 15 (while employed as a hostess, Ms. Salazar was not engaged in SGA).) Nor did the ALJ explain why she nevertheless concluded that Ms. Salazar could have worked more than she actually did. *Cf.* 20 C.F.R. § 404.1571 ("[E]ven if the work you have done was not [SGA], it *may* show that you are able to do more work than you actually did.") (emphasis added). In addition, the ALJ did not discuss that although Ms. Salazar told her neurologist her migraines were fewer and less intense, he still doubled the dose of her injections "to see if we can get better control" of them. (AR 997.)

With respect to Ms. Salazar's sinus surgery, in turn, the ALJ failed to note that the surgery took place less than a month before the end of the closed period of disability the ALJ considered, (AR 15, 885-86), and that Ms. Salazar doubtless required time to recover from it. Thus, the relief from migraines the sinus surgery provided would not have enabled Ms. Salazar to work until the very end of the closed period. Nor did the ALJ discuss that Ms. Salazar's "most recent" treatment notes in the record post-date the closed period and also pre-date August 23, 2020, when she testified that she halved her hours as a cashier due to her migraines resuming. (AR 21; *see* AR

_____

decision would require us to overstep our institutional role and usurp essential functions committed in the first instance to the administrative process.").

1004 (July 13, 2020 treatment note by Dr. Ravilochan).) And again, the ALJ's internally inconsistent findings regarding whether Ms. Salazar continued to work full-time after August 2020 prevent the Court from determining if the ALJ's findings are supported by substantial evidence. (AR 15, 18, 19); *Aguilar*, 356 F. Supp. 3d at 1148.

In addition to the foregoing problems with the reasons the ALJ actually gave, the Court notes two problematic omissions in the ALJ's discussion of Ms. Salazar's migraines. First, the ALJ failed to discuss many of the occasions on which Ms. Salazar complained of frequent or recurrent and debilitating migraines to her healthcare providers, *i.e.*:

- On April 20, 2016, FNP McQuade noted that Ms. Salazar's headaches "are increasing in frequency and becoming more difficult to manage," (AR 378);

- On September 23, 2016, FNP McQuade noted that Ms. Salazar had "worse [sic] migraine in years earlier this week with little relief from treatment," (AR 371);

- On December 23, 2016, John Wells, D.O., at the Holy Cross Hospital emergency room noted that Ms. Salazar reported a migraine headache "off and on for the past week … with little relief" from medication, and that she had had such headaches "frequently for years," (AR 394);

- On January 4, 2017, FNP McQuade noted Ms. Salazar's report of "[w]eekly migraine[s] … with vomiting, photophobia and dizziness with gait change," (AR 367);

- On January 14, 2019, chiropractor Gerald D. Smalling noted Ms. Salazar's report of "severe migraine episodes, debilitating," (AR 759);

- On June 10, 2019, Michaud Koryn, CNP, noted that Ms. Salazar was "waking more frequently with headaches," and "continue[d]to have very frequent migraines," (AR 864);

- On September 30, 2019, NP Guzman noted that Ms. Salazar's "15 to 20 migraines a month" and "head pain upon waking every day" were "an improvement," (AR 972); and,

- On October 3, 2019, Dr. Ravilochan noted Ms. Salazar's reports that none of the "multiple" medications she had tried had "helped decrease the frequency and intensity of her migraines," that she got "about 15-20 migraines per month," and

that she used "to be a medical assistant but she had to miss a lot of work because of her migraines and therefore could not keep a job." (AR 990.)

The ALJ did not discuss this significantly probative evidence. (AR 18-19.)

Second, the ALJ failed to explain why she apparently credited some portions of Ms. Salazar's testimony regarding her migraine triggers but rejected others, including her testimony regarding two triggers likely to limit what jobs she can perform. Specifically, the ALJ appeared to credit Ms. Salazar's testimony that "environmental irritants" and "sunlight" trigger her migraines, because the ALJ prohibited exposure to these conditions in Ms. Salazar's assigned RFC. (AR 17, 45, 55.) However, the ALJ apparently rejected Ms. Salazar's uncontroverted testimony that sitting in a certain position for too long and too-bright and fluorescent indoor lighting are also migraine triggers, because the assigned RFC includes no limitations regarding these conditions. (AR 17, 45, 51-52.) Nor did the ALJ explain why she rejected Ms. Salazar's testimony regarding these triggers.

In sum, the ALJ's failure to discuss or give adequate reasons for rejecting significantly probative evidence supporting Ms. Salazar's testimony regarding the frequency and intensity of her migraines leaves the Court unable to determine whether the ALJ applied correct legal standards and whether her decision was supported by substantial evidence. *Jensen*, 436 F.3d at 1165; *Clifton*, 79 F.3d at 1009-10. Also, the ALJ's failure to explain why she apparently credited some portions of Ms. Salazar's uncontroverted testimony regarding her migraine triggers but rejected others poses the same problem. Remand is therefore warranted.

## IV.   CONCLUSION

For the reasons set forth above, Ms. Salazar's Opposed Motion to Reverse and/or Remand (Doc. 23) is GRANTED.

IT IS SO ORDERED.

_____
KIRTAN KHALSA
UNITED STATES MAGISTRATE JUDGE